Homer Snyder v. Commissioner.
Snyder v. Commissioner
Docket No. 694.
United States Tax Court
1944 Tax Ct. Memo LEXIS 301; 3 T.C.M. (CCH) 322; T.C.M. (RIA) 44113; April 5, 1944
*301 Earl Waring Dunn, Esq., 437 Michigan Tr. Bldg., Grand Rapids, Mich., for the petitioner. William B. Crosswhite, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent has determined that petitioner is liable for unjust enrichment tax in the amount of $12,867.92. He has imposed penalties of 25 percent for delinquency, $3,216.98, and 5 percent for negligence, $643.40. The tax is imposed under section 501 (a) (1) of the Revenue Act of 1936. Respondent has determined that petitioner was a processor of hogs during 1935, and that he derived net income in the amount of $16,084.90 which is attributable to failure to pay processing tax, the burden of which was shifted to others. Petitioner did not file an unjust enrichment tax return for the year 1935. A return for the taxable year was filed for him by the collector for the district of Michigan on March 10, 1941. Findings of Fact Petitioner owns and resides on a 208 acre farm near Caledonia in Kent County, Michigan. During, and prior to, the taxable year he was engaged in farming. His principal crops consisted of apples, corn, potatoes, wheat, and hay. For the past 34 years, petitioner has also *302 been engaged in butchering livestock. Since the year 1918, he has had a slaughter-house on his farm and has butchered at his own slaughter-house. In the taxable year, from January 1, 1935, to October 24, 1935, petitioner had a checking account at the Peoples National Bank of Grand Rapids. He used this account as a depository for all of his enterprises, including the proceeds from the sale of his crops, income derived from his dealings in buying, selling, and butchering livestock, and as a depository for the funds of the country school with which he was connected. On October 24, 1935, the collector of internal revenue issued a warrant of distraint on petitioner's checking account. Subsequently, on November 1, 1935, petitioner opened a new account in his wife's name. In January 1935, Myron Oatman, a neighboring farmer, on behalf of himself and his brother, Clarence, requested the use of petitioner's slaughter-house for the purpose of slaughtering their hogs. Myron was also known as "Mike" Oatman, and Clarence, whose middle name is Benjamin, was also known as "Pat"' Oatman. Petitioner consented to allow them to use his slaughter-house upon the conditions that they keep it clean and *303 haul the inedible offal out to his fields. Myron and Clarence slaughtered their hogs at petitioner's slaughter-house under these conditions during the months of January, February, March, and April of 1935. They sold dressed meat and some live hogs in the vicinity of Grand Rapids. Petitioner assisted them in some of the slaughtering, and in return Clarence later helped petitioner in haying and harvesting. Petitioner did not take any part in purchasing the hogs to be slaughtered, he took no part in marketing them, and he did not receive any of the profits or any other compensation from the enterprise. Petitioner was not a joint venturer with Myron and Clarence Oatman during January to April, inclusive, of 1935. On or about June 1, 1935, Clarence Oatman moved into a house owned by petitioner and located on petitioner's farm. He lived there until shortly after October 24, 1935, the date petitioner's bank account was distrained by the collector. He then moved away. Clarence and Myron continued to slaughter hogs at petitioner's slaughter-house. On June 3, 1935, petitioner borrowed $1,000 from a bank, and deposited $1,035 in cash and $169.36 in checks, in his checking account. On the night *304 of June 3, 1935, petitioner and Clarence Oatman drove to Chicago in Clarence's car. They arrived at the stockyards the following morning and purchased 60 hogs at 10 cents a pound for $1,040, and 30 sheep for $395. The hogs and sheep were paid for with petitioner's check drawn on his account at the Peoples National Bank of Grand Rapids. The hogs and sheep were delivered in the same truckload to petitioner's slaughter-house, on the morning of June 5, 1935. The hogs were slaughtered in petitioner's slaughter-house shortly after their arrival, and the carcasses were sold to wholesalers in Grand Rapids. On June 5, 1935, petitioner deposited $101 in cash and $880.47 in checks in his bank account. On June 8, 1935, he deposited $270 in cash and $325.40 in checks. On June 24, 1935, he deposited $75 in cash and $233.80 in checks. Petitioner purchased the above hogs either for himself or in conjunction with Clarence. Clarence did not pay any part of the purchase price of these hogs. From the latter part of August 1935 until October 24, 1935, petitioner purchased 521 hogs for slaughter at his slaughter-house. He paid for these hogs with checks on his own account. In September 1935, petitioner *305 paid an average price of 11 cents per pound for live weight and in October 1935 he paid an average of 10.66 cents per pound. These prices were 50 cents per hundred pounds less than the Detroit market. From the latter part of August to October 1935, inclusive, Clarence Oatman also purchased hogs to be slaughtered at petitioners' slaughter-house. In the first part of September 1935, Myron and Clarence had a disagreement with respect to a truck owned by them jointly which resulted in their severing their business relationship. Myron continued to slaughter at petitioner's farm until the latter part of September, and another brother, Arthur Oatman, was employed by Myron to help him. Clarence Oatman ceased slaughtering at petitioner's slaughter-house and moved away shortly after October 24, 1935, when petitioner's bank account was distrained. During the months of June, July, August, September, and October 1935, the dressed hogs were sold to concerns in the vicinity of Grand Rapids. Most of the sales were made to Thomasma Bros. who are wholesale packers in Grand Rapids, although deliveries were also made to Datema and to Falarski who are butchers in Grand Rapids. Deliveries during June, *306 July, August, and September 1935 were made by Clarence, Myron and Arthur. Petitioner delivered the dressed carcasses in his own truck in October 1935. The checks received from Thomasma Bros. in payment therefor were post-dated and were made payable to either "M. Oatman", "A. Oatman", "Oatman Brothers", or "C. Oatman". None of the Oatman brothers had bank accounts, and the checks received from Thomasma Bros. payable to their order were usually deposited in petitioner's account at the bank, or were cashed by petitioner. One check from O. M. Falarski, dated October 21, 1935, in the amount of $152, for the purchase of 950 pounds of dressed hogs at 16 cents per pound, was made payable to the order of Homer Snyder, although Clarence Oatman had delivered this pork to Falarski. Subsequently petitioner endorsed the receipt, obtained the check from Falarski, and deposited it in his own bank account. The invoices of Thomasma Bros. for the period from July 15, 1935, to October 22, 1935, show that a total of 108,087 pounds of dressed pork were delivered to them from petitioner's slaughter-house for the total price of $16,765.46. During the months of September and October, petitioner made deposits *307 in his bank account of $16,027.40. On the conversion factor of 132, the hogs delivered represent 142,674.84 pounds live weight. The invoices show that the prices for the dressed pork ranged from 14 to 16 3/4 cents per pound for 607 dressed hogs delivered and from 13 to 15 cents per pound for 37 sows. On 9 of the 12 invoices covering the period from July 15, 1935, to September 11, 1935, a notation to the effect that the processing tax has been paid by the slaughterer appears directly above the respective signatures of Myron and Clarence Oatman. Yellow copies of the invoices were turned over to petitioner. All of the above Thomasma Bros. invoices for the month of October 1935 were issued in the name of Clarence Oatman. In addition to the amounts paid by Thomasma Bros. as shown by the invoices, Thomasma Bros. issued checks payable to either "M. Oatman", or "C. Oatman", as follows: 7/15/35 - amount
$ 163.45;
payable to M. Oatman;
endorsed by M. Oatman and Arthur Oatman
7/24/35 - amount
272.85;
payable to M. Oatman;
endorsed by M. Oatman and Arthur Oatman
9/20/35 - amount
764.41;
payable to C. Oatman;
endorsed by C. Oatman and Homer Snyder
9/21/35 - amount
405.45;
payable to M. Oatman;
endorsed by M. Oatman
$1,606.16 *308 The check dated September 20, 1935, for $764.41 was deposited to petitioner's account in the Peoples National Bank of Grand Rapids on September 23, 1935. Petitioner made deposits of cash in his account approximately equal to the total of two of the three other checks. The total sum of $1,606.16, representing miscellaneous checks from Thomasma Bros. constitutes payment for a total of 10,038.56 pounds of dressed pork, or, 13,250.89 pounds live weight. In October 1935, 950 pounds of dressed pork, representing 1,254 pounds of live weight were delivered to Falarski by petitioner. During this period, 950 pounds of dressed pork, representing 1,254 pounds of live weight were delivered to Datema by petitioner. Out of the hogs purchased in Chicago in June 1935 by petitioner, petitioner sold 10,400 pounds of pork live weight. Petitioner processed and sold during the period June to October 1935, inclusive, at least 168,833.73 pounds of pork live weight, which is the total of the following live weight: carcasses from Chicago hogs, 10,400; carcasses sold to Thomasma Bros., 155,925.73; to Falarski, 1,254; to Datema, 1,254. During the taxable year the processing tax was $2.25 per 100 pounds. *309 There was imposed upon and due from petitioner processing tax in the minimum amount of $3,798.77 during 1935, the burden of which was shifted to others and not paid. The average cost per pound of hogs during September and October 1935, was approximately 9 3/4 cents. The selling price per pound of hog carcasses was approximately 16 to 16 1/2 cents. The average number of pounds of pork products derived from 100 pounds of live weight of a type of hog processed by petitioner during September and October 1935 was approximately 76 pounds. The value of offal, both edible and inedible, per hog, during this period was approximately 85 cents. In November 1935, petitioner made an arrangement to purchase and slaughter hogs for Thomasma Bros., and to deliver the dressed pork to them, for 50 cents per head in addition to the edible offal, consisting of the hearts, livers, and tongues. Petitioner advanced his own money in purchasing the hogs and was reimbursed by Thomasma Bros. when he delivered the dressed pork. Peter Salm, a neighboring farmer, was associated with petitioner in the purchase, slaughter, and delivery of hogs in November and December 1935, and shared in the profits. Petitioner *310 and Salm purchased, slaughtered, and delivered 117 hogs to Thomasma Bros. in November and December of 1935. The hogs were purchased for 9 cents per pound. Petitioner was not a processor in November and December 1935. Petitioner was a joint venturer with Clarance and Myron Oatman from June to September 1935, inclusive, and he was a joint venturer with Clarence during October 1935. During the months June to October 1935, inclusive, petitioner, in connection with others, processed hogs upon the hundred weight of which the processing tax applicable thereto was $8,454.49 at the prevailing rate of processing tax of $2.25 per hundred live weight. Petitioner's net income during 1935 from the processing of hogs was not less than the amount of processing taxes imposed but not paid in the amount of $8,454.49. Petitioner did not pay any processing tax in respect of his first processing of hogs. Petitioner's failure to file an unjust enrichment tax return for the taxable year, which was due to be filed on December 15, 1936, was not due to a reasonable cause. Petitioner was negligent in the matter of filing his return. Opinion The tax in this proceeding is imposed by section 501 (a) (1) of *311 the Revenue Act of 1936, [1] which is retroactive to the taxable year. This section imposes a tax upon the processor's net income attributable to the failure to pay the processing tax the burden of which was shifted to others, provided that such tax shall not exceed the net income derived from such processing. Petitioner did not file either processing or unjust enrichment tax returns for the taxable year. Respondent did not have the necessary information to ascertain the amount of net income derived from petitioner's processing of hogs, and therefore respondent deemed petitioner's net income to be at least equal to the amount of processing taxes shifted to others and unpaid by petitioner. *312 Respondent has determined that petitioner was a processor during 1935 in joint ventures with others. In the notice of deficiency, respondent determined that petitioner should have paid processing taxes of $16,084.90, computed as follows: (1) Venture with Myron and Clarence
Oatman
January
$ 369.41
February
776.82
March
619.52
April
805.79
$ 2,571.54
(2) Venture with Clarence Oatman
July
$ 630.23
August
545.92
September
1,709.91
October
2,065.64
$ 4,951.70
(3) Venture with Clarence, Myron and
Arthur Oatman
June
$ 477.41
July
135.07
July
511.25
August
1,038.17
September
1,296.81
October
44.08
$ 3,502.79
(4) Venture with Peter Salm
November
$ 927.59
November estimates
2,065.64
December estimates
2,065.64
$ 5,058.87
$16,084.90
Respondent has determined like deficiencies in unjust enrichment tax against each of the alleged joint venturers for the respective periods of the taxable year. Petitioner contends that he was not a venturer with any one of the Oatmans at any time during the taxable year. With respect to the alleged venture with Clarence Oatman in the months of July to October 1935, inclusive, petitioner claims in the alternative *313 that respondent's determination of the net income therefrom was excessive. With respect to the alleged venture with Peter Salm in the months of November and December, 1935, petitioner argues that he and Salm were not the processors, and, in the alternative, that respondent's determination of the net income therefrom was excessive. Respondent contends that petitioner has not overcome the presumption of the correctness of his determinations. The principal questions in this proceeding are (1) whether petitioner processed any hogs in the taxable year upon which the processing tax was unpaid by him, although such tax was included in the purchase price of the hogs sold; (2) the amount of petitioner's net income attributable to the shifting of the burden of the processing tax and the failure by petitioner to pay the tax; (3) the net income realized from the entire enterprise of processing hogs; (4) the amount of the processing tax shifted and not paid. These questions are essentially questions of fact, necessitating in each instance a determination of whether petitioner has overcome the presumption of the correctness of respondent's determination. We think petitioner's contention that *314 he was not a joint venturer with Clarence and Myron Oatman during the first four months of the taxable year must be sustained. Petitioner testified that during the first four months of 1935, he merely allowed Myron and Clarence to use his slaughter-house for the purpose of slaughtering their own hogs; that he did not share in the profits or the losses of their enterprise; and that he had no control over their purchase, slaughter, or sale of hogs. This evidence was corroborated by Myron and Clarence. Respondent draws the inference that petitioner was such joint venturer because of the fact that on January 26 and February 2, 1935, petitioner made deposits in his bank account in the amounts of $882.48. and $1,013.13, respectively. However, an inference can be drawn that these deposits were not deposits of sums realized from the processing and sale of hogs. There is evidence that petitioner used his bank account as a depository for the receipts from all of his various enterprises, which included farming. He also made deposits of school funds in his bank account. Petitioner made numerous deposits in his account during this period. In view of the testimony of other persons than petitioner, *315 which stands unrefuted, we cannot make our conclusion dependent upon the inference drawn by respondent. It is held that petitioner has overcome the presumptive correctness of respondent's determination; that he was not a joint venturer with Myron and Clarence during the first four months of 1935; that he did not slaughter hogs; and that he had no net income during this period within the meaning of section 501 (a) (1) of the Revenue Act of 1936. Also, it does not appear from the evidence that petitioner and Peter Salm were processors during the months of November and December 1935. Petitioner concedes that he and Salm worked together, but he contends that he and Salm were employees of Thomasma Bros. Petitioner testified that he was reimbursed by Thomasma Bros. for the cost of the hogs that he purchased, and that he bought, slaughtered, and delivered hogs to Thomasma Bros. for an agreed compensation of 50 cents per hog and the edible offal. He says that he was merely employed by Thomasma Bros. to do this work for them, and that Thomasma Bros. were the processors of the hogs. Although Salm's testimony is not entirely satisfactory, it does, on the whole, corroborate petitioner's testimony. *316 The evidence shows that respondent merely made an estimate for the months of November and December in the amount of $2,065.64 for each month, and that this estimate was not based upon any facts of which he had knowledge but was the same amount, $2,065.64, which he had arrived at for the previous month of October. He assumed that petitioner and Salm processed the same number of hogs in the months of November and December as had been processed in the month of October. There is no evidence rebutting petitioner's testimony that he and Salm were not processors in November and December. At the trial, respondent called Walter and Thomas Thomasma, two of the partners of Thomasma Bros., as witnesses, after petitioner and Salm had testified. The two brothers testified at some length with respect to the period from June to October of the taxable year but gave no testimony with respect to November and December, nor were any of Thomasma Bros'. invoices produced for November and December showing any sales of hogs to them by petitioner or Salm to refute the testimony of petitioner and Salm. The Thomasma brothers were witnesses from whom rebuttal testimony could have been adduced, it would seem. *317 Such rebuttal testimony was not adduced. It is concluded that petitioner has overcome the presumption of the correctness of respondent's determination for this period, and it is held that he was not a processor in the months of November and December 1935. Not being a processor, he did not shift any taxes to others within the meaning of section 501 (a) (1). A different situation existed for the period from June to October, inclusive. With respect to this period, the record is clear that petitioner was a joint venturer with the Oatmans in the buying, slaughtering, and selling of hogs. The joint venture with Myron and Clarence had its inception at the time of the purchase of hogs in Chicago on June 4, 1935, and continued until Myron left petitioner's farm to do his slaughtering elsewhere, sometime in the latter part of September. From the time Myron left petitioner's farm in September, and until October 23, 1935, petitioner continued to be a joint venturer with Clarence. There are a number of inconsistencies in the testimony of petitioner and Clarence with respect to the purchase of the Chicago hogs and the evidence brought out at the trial seems to support, rather than rebut, respondent's *318 contention that petitioner was a joint venturer with Myron and Clarence Oatman in regard to the slaughter and sale of the hogs purchased in Chicago in June 1935. On June 3, 1935, petitioner borrowed $1,000 from the bank and deposited $1,035 in cash to his account. He and Clarence drove to Chicago in Clarence's car late that night. Petitioner drew a check on his account in full payment of the hogs and sheep. Oatman had neither enough money to purchase the hogs, nor a permit to use to get the hogs shipped from Chicago to Grand Rapids. Petitioner went to Chicago supplied with sufficient funds and a permit which he had borrowed from Salm. Testimony of both petitioner and Oatman about Oatman's repaying petitioner some amount for the hogs purchased in Chicago is conflicting. It is not convincing. Deposit slips to petitioner's bank account do not show that he deposited any of the various sums, which again are in conflict, which he asserts were paid to him by Oatman. On the other hand, there is no conflict or doubt about the following evidence, to wit, that on June 3rd, petitioner deposited in his bank account, $1,204; he went to Chicago on the night of June 3rd; he purchased hogs there on *319 June 4th; the hogs were delivered to his slaughter house on the morning of June 5th. Petitioner's evidence relating to this period is conflicting, contradictory, and not credible. Nor does the evidence submitted with respect to the months of July, August, September, and October, 1935, convince us that petitioner was not associated with the Oatmans in the buying, slaughtering, and selling of hogs. Little evidence has been produced with respect to the months of July and August, 1935, but the evidence shows that nearly all of the Thomasma Bros. checks received by the Oatman brothers in September and October were deposited to petitioner's account and that the Oatmans turned over the yellow copies of the Thomasma Bros.' invoices to him. In the latter part of August, September, and October, 1935, petitioner purchased hogs for slaughter and, in October 1935, he made deliveries of dressed pork. Petitioner and Clarence both testified that after Clarence and Myron severed their relationship, petitioner had an agreement with Clarence whereby petitioner purchased the hogs in September and October for Clarence for 50 cents per head, as Clarence was too busy to buy them himself; that when Snyder *320 delivered and dressed pork he received the hearts, livers, and tongues; and that Snyder did not share in the profits or losses of the enterprise. The evidence, however, shows that petitioner paid for the live hogs purchased by him with checks on his own bank account; that they were slaughtered at petitioner's slaughter-house; that he received and kept the vouchers evidencing the sales of the dressed pork; and that he "struck a balance" with Clarence once a week. It is not clear exactly when Myron ceased slaughtering at petitioner's slaughter-house. Myron testified that he broke off with Clarence in June or July, and subsequently moved away from Snyder's in July or August, because Snyder was busy farming and "didn't have time to butcher". Petitioner testified that Myron and Clarence discontinued their business relationship about the first week in September, and that Myron after slaughtering for a short time, moved away. It appears significant that both Myron and Clarence continued to slaughter at petitioner's slaughter-house after the alleged breach in their relationship, and that Clarence did not finally cease slaughtering at petitioner's slaughter-house until the restraining order *321 was placed on Snyder's bank account in the latter part of Cotober. The evidence indicates that Myron slaughtered under the same arrangements with Snyder up until the time he moved away, which appears to be in the latter part of September 1935. The evidence also shows that the Falarski check was made payable to Snyder, even though the dressed pork was delivered by Clarence, and that Snyder signed the receipt and obtained the check himself, depositing the money to his account. Neither petitioner, Clarence, nor Myron introduced any books or records at the trial to support their testimony. Clarence stated that he had kept books during this period but that he lost them in moving continuously for "it is cheaper to move than to pay rent" The evidence submitted in behalf of petitioner is not convincing. Respondent's determination that petitioner was a venturer with Clarence and Myron Oatman during the months of June to October 1935, inclusive, must be sustained, in the absence of clear and convincing proof to the contrary. Arthur Oatman was nothing more than an employee of Myron after Myron severed his relations with Clarence in September 1935. It is, therefore, held that petitioner was *322 a joint venturer with Clarence and Myron Oatman from June to September 1935, inclusive; and that petitioner was a joint venturer with Clarence during October. At the trial of this proceeding, the witness Falarski, upon respondent's direct examination, testified that Clarence Oatman told him that petitioner was Clarence Oatman's partner in the purchase, slaughtering, and sale of hogs. Petitioner's objection to this testimony was overruled and an exception was duly taken by him. Subsequently, petitioner filed a motion that this ruling be reconsidered. Petitioner's motion for reconsideration is granted. Upon reconsideration, however, it is held that the testimony is admissible and the original ruling is affirmed. The law is well settled that a declaration by one partner as to the existence of a partnership, not made in the presence of his co-partner, is not admissible in evidence to prove the existence of the partnership so as to bind the co-partner. Where, however, there is other evidence of the partnership, independent of the partner's declaration, such declaration is admissible in evidence. Rowley's Modern Law of Partnership, vol. 2, § 889, pages 1243, 1244. Prior to Falarski's *323 testimony, there was ample evidence as to the existence of a joint venture between petitioner and Clarence Oatman. Falarski's testimony is therefore admissible. However in reaching our conclusion that a joint venture existed between petitioner and Clarence Oatman, we have given little weight to Falarski's statement with respect to Clarence Oatman's declaration of a partnership between him and petitioner. On brief, petitioner concedes that the "vendors" of the dressed pork had shifted the tax to the vendees, and that the processing tax was not paid. Under our holding above, that petitioner was a joint venturer with Clarence and Myron Oatman during the period from June to October, inclusive, and it appearing that they assumed the liability for the processing tax but failed to pay it, it becomes necessary to consider petitioner's alternative contention. Petitioner contends that his entire net income for the months of June to August, inclusive, amounted to $77.80, which figure, in effect, petitioner reached by reiterating his original contention that he was not a joint venturer with the Oatmans. Petitioner testified that the only income he received consisted of $260.50 for purchasing *324 521 hogs at 50 cents per head for Clarence Oatman in August, September, and October, plus $100 he received for delivering the carcasses. From that alleged gross income of $360.50 petitioner has subtracted operating expenses of $18.75 for his truck and the loss of $263.95 he sustained in damages to his automobile. It has been concluded that petitioner was a joint venturer with Clarence and Myron, from June to October, inconclusive. Petitioner's testimony with respect to his net income is inadequate. The testimony of Clarence and Myron Oatman with respect to the income they received is vague, entirely from memory, and insufficient to determine the net income the three parties received from the purchase, slaughter, and sale of hogs from June to October, inclusive. No evidence was introduced by Clarence or Myron as to expenses incurred by them throughout the period. The market for both live and dressed weight varied from day to day and the evidence is not specific as to the dates of purchases and sales. Evidence was not introduced to show the extent of the sales to Datema, although it may be assumed that they were small in comparison to the sales to Thomasma Bros. Petitioner has failed *325 to introduce evidence to sustain his contention under this point. Respondent's determination that the net income from the processing of hogs was not less than the amount of processing taxes shifted and not paid during the months of June to October, inclusive, is sustained. . The last question to be determined is the amount of the processing tax which was due for processing during the period June to October, inclusive, the burden of which was shifted to others and not paid by the petitioner. Respondent has determined that the amount of the tax was $8,454.49. The evidence shows that his method of computing the tax was fair and reasonable and in accordance with the usual method; that the conversion factor of 73.5 which he used to get pounds live weight was fair, reasonable, and average; that he used the correct rate of tax, $2.25 per hundred pounds live weight. The burden of proof, which was upon petitioner, under this last question was to prove by clear and convincing evidence that respondent's calculation of the tax was incorrect. His burden went further. He had the burden of producing evidence from which *326 a correct determination of the processing tax could be made. affd., . Petitioner has failed to meet the burden of proof on all questions under the issue as it relates to the period June to October, inclusive, including his burden under this last issue. Petitioner has entered only a general denial to everything. His denials have been shown to be, rather, an obstinate refusal to produce evidence to show clearly and convincingly what his operations were and how extensive they were. To refute petitioner's testimony of general denial, respondent produced evidence which shows that petitioner processed at least 168,833.73 pounds live weight; that he received payment from Thomasma Bros. in a total amount of at least $16,765.46, plus $764.41, plus two or three hundred dollars more; that he received payment of $152 from Falarski; that deliveries were made to Datema. All of this evidence destroys the credibility of petitioner's testimony and of other testimony produced in his behalf that he was not a processor, or that his income from processing was slight, if not negligible. *327 There was no burden upon respondent to prove any matters at issue. See . No "new matter" was pleaded affirmatively by respondent in his answer, which put upon the respondent a burden of proving any new averments. Respondent, in determining the deficiency in tax, determined that petitioner, in conjunction with others, was a processor during 1935. Petitioner, in his petition, denied this, and respondent, in his answer, restated his position. That he stated in his answer that he was prepared to rebut petitioner's general denial was not a pleading of any "new matter". The general issue arises out of respondent's determination as set forth in the notice of deficiency and his determination is prima facie correct. At the trial, after adhering to his general denial, petitioner was confronted with evidence produced by respondent's witnesses which seriously impaired the credibility of his testimony and of testimony offered on his behalf. However, he did not undertake to "mend his fences" and produce evidence upon which it could be determined that he became liable for processing tax in a lesser amount than $8,454.49 for the period *328 of June to October, inclusive. The evidence supports the conclusion that he was a processor during that period, and that he processed products subject to the processing tax in an amount of at least 168,833.73 pounds live weight. Respondent's determination with respect to this period is that petitioner processed 375,755.11 pounds live weight. The burden upon petitioner required him to prove the correct number of 100-pounds live weight which he did process. This he has not done. Our only course, in this situation, is to sustain respondent's determination. Accordingly, it is held that petitioner, having failed to prove that he did not process less than 375,755.11 pounds live weight during the taxable year, and that he did not realize income from the sale of articles subject to the processing tax in the amount of at least $8,454.49, during the period of June to October, 1935, inclusive, is liable for unjust enrichment tax upon $8,454.49. Respondent's determination relating to this period is sustained. Petitioner's unjust enrichment tax return was due December 15, 1936. The return was filed for petitioner by respondent on March 10, 1941. Respondent imposed a delinquency penalty of 25 *329 percent under section 3612 (d) (1) of the Code, and a negligence penalty of a 5 percent under section 293 (a) of the Code. Unlike a fraud penalty, the burden of proof with respect to the penalties herein imposed lies on petitioner. With respect to the delinquency penalty, petitioner has not offered any evidence to show that the failure to file a return within the time prescribed by law was due to reasonable cause and not to wilful neglect. Petitioner also has not introduced any evidence to show that he exercised due care in the matter of reporting income and was not negligent. Respondent's imposition of the penalties accordingly must be approved. The amount of each penalty is recomputed on the basis of the amount of the deficiency under the holdings made. ; ; affd., , certiorari denied, - U.S. - (Dec. 13, 1943); ; affd., , certiorari denied, ; . *330 Decision will be entered that there is a deficiency in petitioner's unjust enrichment tax in the amount of $6,763.59, that the 25 percent penalty is $1,690.90, and that the negligence penalty is $338.18. Footnotes
1. SEC. 501. TAX ON NET INCOME FROM CERTAIN SOURCES. (a) The following taxes shall be levied, collected, and paid for each taxable year (in addition to any other tax on net income), upon the net income of every person which arises from the sources specified below: (1) A tax equal to 80 percentum of that portion of the net income from the sale of articles with respect to which a Federal excise tax was imposed on such person but not paid which is attributable to shifting to others to any extent the burden of such Federal excise tax and which does not exceed such person's net income for the entire taxable year from the sale of articles with respect to which such Federal excise tax was imposed.↩